IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:14cr213 |
| ) | |
| MARCEL LEHEL LAZAR, ) | Hon. James C. Cacheris |
| ) | |
| Defendant. ) | Sentencing: September 1, 2016 |
| ) | |

**DEFENDANT'S POSITION ON SENTENCING FACTORS**

Marcel Lehel Lazar comes before the Court to be sentenced for the offenses of unauthorized access of computers and related identity theft based on his hacking activities in 2012 and 2013. Mr. Lazar has consistently and repeatedly admitted his wrongdoing since his arrest and prosecution in Romania in January 2014 on related charges, where he received a total sentence of 7 years, most of which he still has left to serve. When the United States sought to extradite him to face similar charges in this country, Mr. Lazar made it known that he was prepared to plead guilty once he arrived, which he did. Even before pleading guilty, Mr. Lazar spoke voluntarily to investigators both here and in Romania, and then agreed to formally and truthfully cooperate with the government as part of his plea agreement in this case, and has done so.

While there is no question that Mr. Lazar's hacking activity was serious and extensive, it was not particularly sophisticated, and his intent was never to steal money or otherwise profit from the information to which he gained access, and, indeed, he did not do so. Here, as set forth in the PSR, the advisory guideline range recommends a sentence of 21 to 27 months for the § 1030 offense, plus a mandatory 24-month consecutive sentence for the § 1028A offense. While

the guideline range in every case is advisory, the range in this case, whatever it may be, is particularly imperfect because it does not account for the fact that Mr. Lazar has received a separate, significant punishment for the same course of conduct. As indicated above, prior to his extradition to the United States, Mr. Lazar was prosecuted in Romania and sentenced to a total term of imprisonment of 7 years (as delineated in footnote 1 below) in connection with his hacking of Romanian officials' accounts during the same period of time that he hacked into the accounts of Americans, the subject of his prosecution in this case.[1] Thus, the sentence imposed by this Court is not the only punishment that Mr. Lazar will receive, or sentence of imprisonment that he must serve, for his wrongdoing.

It is respectfully submitted that the mandate of 18 U.S.C. § 3553 to impose the least amount of incarceration necessary to achieve the goals of sentencing in this case cannot be fulfilled without taking into account the total amount of incarceration that Mr. Lazar must serve in both jurisdictions. Accordingly, for the reasons set forth more fully in this memorandum and Defendant's supplemental sentencing memorandum (filed under seal), including his cooperation with the government, it is respectfully submitted that a total sentence of 36 months in this case (12 months for Count 5 and 24 months for Count 7), on top of the 7-year term of imprisonment imposed in Romania, is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

---

[1] With respect to the 7-year Romanian sentence, Mr. Lazar received a 4-year sentence for hacking activity in 2013 and a consecutive 3-year "violation" sentence for committing this misconduct while on probation from a 2011 prosecution for hacking.

## BACKGROUND

Mr. Lazar has been in continuous custody since January 2014, when he was arrested in Romania for unauthorized access of Romanian officials' accounts. He was convicted and sentenced in Romania in June 2014 as discussed more fully below. The United States then sought Mr. Lazar's extradition as he served his 7-year sentence imposed in Romania. After the entry of a formal extradition agreement between the two countries on March 23, 2016, Mr. Lazar was extradited from Romania to the United States approximately one week later, on March 31, 2016. The extradition agreement allows for the temporary surrender of Mr. Lazar to the United States for prosecution.

On May 25, 2016, Mr. Lazar pleaded guilty to Count 5 of the indictment, unauthorized access of a protected computer in violation of 18 U.S.C. § 1030(a)(2)(C), and Count 7, aggravated identity theft in violation of 18 U.S.C. § 1028A. The case was continued for sentencing and the preparation of a Presentence Investigation Report ("PSR").

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the *Federal Rules of Criminal Procedure*, and Section 6A1.3 of the advisory *United States Sentencing Guidelines*, Mr. Lazar, by counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR"), and has no objections to the report.

## ARGUMENT

**I.    Advisory Sentencing Range**

The advisory guideline range in the PSR recommends a sentence of 21 to 27 months for Count 5, plus a mandatory 24 month sentence for Count 7. Under the sentencing guidelines' directives for calculating criminal history scores, foreign convictions are not counted, thus

resulting in Mr. Lazar's placement in criminal history category I. As the PSR notes, the sentencing guidelines recognize that an upward departure may be appropriate in certain cases involving foreign convictions to address concerns regarding recidivism, and the government argues for an upward departure from category I to category II based on Mr. Lazar's prior conviction in Romania for illegal hacking in 2011.

    Although there is little discussion in the sentencing guideline manual regarding the rationale for not "scoring" foreign convictions, common sense suggests that differences between legal systems and constitutional guarantees in the United States and foreign countries are at the heart of the policy. Here, while there is no reason to doubt the validity of Mr. Lazar's 2011/2012 Romania conviction for hacking (he was charged in 2011 and sentenced in 2012 to a 3 year suspended sentence with probation), the Romania legal process nonetheless differs from that of the United States at least so far as Romania does not have jury trials.

    Mr. Lazar acknowledges that the Court may properly consider the existence of this prior misconduct in determining a sentence in this case under the § 3553(a) factors and does not dispute the government's analysis that had the conviction been from the United States, it would result in a category II criminal history score. Nevertheless, it is respectfully submitted that an upward departure, and the resulting increase in the recommended sentence, is not warranted here given the overlapping prosecutions of Mr. Lazar in Romania and the United States, and the substantial punishment that he received in Romania.

    When Mr. Lazar engaged in the additional course of hacking which is the subject of his 2014 Romanian prosecution and his current prosecution in the United States, the Romanian courts acted swiftly and imposed a significant sanction for his reoffending. Upon his arrest in

January 2014, he was detained during the pendency of dual proceedings there - for the new offense conduct and the violation of the terms of his earlier probation.  Imposing sentence on both matters at the same time, the Bucharest court sentenced Mr. Lazar in June 2014 to a 4-year term of imprisonment for the new conduct, which the court indicated was the most severe sanction available, and further imposed a consecutive 3-year period of imprisonment for violating the terms of his probation imposed in the earlier case, which represented the full term of the originally suspended sentence.  PSR, ¶¶ 81-82.  Thus, it appears that the Romanian court may well have given Mr. Lazar the most severe punishment available.

 For someone like Mr. Lazar who had never before been sentenced to imprisonment, the 7-year total sentence imposed by the Romanian court in 2014 is substantial.  In addition to the length of the sentence itself, Mr. Lazar was also sent to a high security prison to serve his sentence, where, prior to his extradition to the United States, he spent 21 of 24 hours each day locked in a cell.

 Mr. Lazar recognizes that the severity of the sanction imposed in Romania is due to his own actions and his failure to cease his on-line activities, which became an addiction of sorts, during which he spent hour-upon-hour each day on the computer.  While there is no dispute that the conduct underlying Mr. Lazar's recent prosecution in Romania and current prosecution in the United States does not represent his first offense, given the heavy punishment he has already received for reoffending, Mr. Lazar submits that no further sentence increase in this case is necessary to account for his prior misconduct or further deter him from engaging in future misconduct.  *See generally United States v. Mishoe,* 241 F.3d 214, 220 (2d Cir. 2001) (recognizing that a defendant who has not previously been sentenced to any lengthy period of

incarceration may very well be deterred by a shorter period of incarceration than someone who has received prior sentences of substantial incarceration).

**II.      Legal Standard**

The overriding mandate of § 3553(a) requires courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation. The advisory Sentencing Guidelines, while "the starting point and the initial benchmark," are nevertheless "only one of the factors to consider when imposing [a] sentence . . . ." *Gall v. United States*, 552 U.S. 38, 49, 59 (2007). Indeed, a sentencing court may find that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). After the district court correctly calculates the advisory Guidelines range, it is then free simply to disagree with the Guidelines' "rough approximation" of the appropriate sentence for any given case. Id. at 350.

Importantly, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (per curiam) (emphasis in original). In other words, sentencing courts commit legal error by treating the Guidelines range as a default sentence and presuming that the sentence should come from the Guidelines. *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). Rather, the Guidelines are simply an advisory tool to be considered alongside other (co-equal) statutory considerations spelled out in § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005).

The factors for the court to consider include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the Guidelines range, (5) the need to avoid unwarranted sentencing disparities; (6) the need for restitution, and (7) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a). A district court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary to achieve the goals of § 3553(a).

## III.  A Total Sentence of 36 Months is Warranted Under The § 3553(a) Factors

### A.  *Personal History of Marcel Lehel Lazar*

Mr. Lazar is a 44 year old citizen of Romania from a modest, working class background. His father, now in his mid 70s, is retired, and his mother, in her 60s, works a waitress. Mr. Lazar graduated high school in 1990 but did not attend any further schooling or higher education programs, which are very expensive in Romania. Indeed, for the average citizen living under communist rule in Romania in the 1990s, conditions were bleak with deep poverty and food shortages. *See Remembering Life in Romania under communist rule*, The Economist (Sept. 1, 2015).[2] In 1992, Romania's Gross Domestic Product per Capita was measured at an all-time low of $4323. *See* Trading Economics, Romania GDP per capita.[3]

---

[2] Available at http://www.economist.com/blogs/prospero/2015/09/poetry.

[3] Available at http://www.tradingeconomics.com/romania/gdp-per-capita.

Over the course of his adult life, such lack of further schooling and training, in combination with the state of the Romanian economy, has restricted Mr. Lazar's employment prospects. Other than a year of mandatory military service during communist rule in Romania, his work history has consisted of a variety of semi-skilled and manual labor jobs, including most recently as a taxi driver. He met his wife while working as a delivery man for Coca-Cola, one of his earliest jobs after graduation. Mr. Lazar and his wife married three years later, and had a daughter together, who is now 11 years old. PSR, ¶¶ 89-91, 104.

The attached letters from Mr. Lazar's family members present a much different view of Mr. Lazar than his admittedly brash on-line personality – as a caring and devoted husband and father, considerate and generous to his extended family. *See* Letters of G. Lazar, A. Bilti, and M. Rosca, attached hereto as Exhibit 1. His family members also describe Mr. Lazar's aspirations and struggles to obtain a well-paying job in the computer field with his self-taught skills. Without any formal training or certificates, he was not able to obtain such employment:

> His ambitions in life are to find a job well payed in the field of informatics. Even though he has no training in the field he is very good. Unfortunately in Romania wages are very low, so he had to work as a taxi driver as to maintain his wife and daughter.

Ex. 1, Letter of A. Bilti.

> Marcel is a loving and hard working husband. In the last period it was difficult to him to find a job. Arad is a small town there are a few job and low wages ... To get a job the employers ask you a lot of certificates and Marcel didn't have so much experience that's why nobody employed him.

Ex. 1, Letter of G. Lazar.

Apart from his acknowledged hacking activity, Mr. Lazar has no other criminal history. He has absolutely no history of drug or alcohol abuse, violence, or any other kind of criminal behavior. PSR, ¶¶ 81-82, 98.

### B.     The Nature of The Offense

From late 2012 to his arrest in January 2014, using a basic laptop computer located in his home in Romania, Mr. Lazar illegally accessed personal on-line accounts of numerous individuals, including current Romanian government officials, former U.S. officials as well as celebrities. He also published personal data of some of the victims. It was a single course of conduct which ceased when he was arrested by Romanian officials in January 2014, and prosecuted there for the conduct involving Romanian officials.[4] Although he had access to many victims' financial information, he did not use this information to steal money or otherwise make money from his exploits. With his lack of formal computer training, his skills were self-taught. He did not use highly sophisticated tools or skills to access victims' accounts, but rather conducted on-line research to determine the account owners' answers to security questions in order to reset their passwords (by way of example, a standard security question asks for an account holder's city of birth), and then gain access to their on-line accounts.

Like several other recent hacking cases, Mr. Lazar was not motivated by financial gain but principally by a desire to bring to light actions of public officials and those in power in order to expose what he saw as hypocrisy, especially in those connected to the defense and intelligence

---

[4] Beyond the fact that he accessed the accounts of Romanians and Americans during the same time frame, there is also direct overlap between the charges against Mr. Lazar in Romania and the United States in that some of the correspondence he gained access to and published was directly between public officials identified as victims in the Romania and the United States charging documents.

sectors which support and rely on government electronic surveillance, and to further public discourse, although he did so without the specialized knowledge or technical skills of an expert hacker. His efforts were certainly misguided and harmful to numerous victims, and he recognizes that he will be punished accordingly, as he already has been in Romania.

      Since his arrest in Romania in January 2014, Mr. Lazar has taken several actions which demonstrate his acceptance of responsibility for his misconduct. He admitted his guilt in the Romanian proceedings, and was sentenced to a total period of imprisonment of 7 years as described above. After his extradition to the United States, he pled guilty to charges in this district. Both before and after his plea, he voluntarily cooperated with law enforcement authorities, including the U.S. Attorney's Office and federal agents representing several departments and agencies, and has attempted to aid the government in removing victims' personal information from the public realm. Mr. Lazar's active and continued cooperation shows his acceptance of responsibility for his actions. *See also Def. Suppl. Sent. Memo.*

      While it is understandably troubling that Mr. Lazar continued to engage in hacking activities, he has now received a lengthy sentence in his home country, been sent for further prosecution to a foreign country where he has no ties, and separated from his family. Throughout his detention in this district, false rumors have been reported in various media outlets that he has been physically harmed or even found dead, which has caused great upset to his family in Romania.[5]

---

[5]Presumably due to multiple media inquiries, the Alexandria Detention Center issued a statement in July 2016 verifying that Mr. Lazar was "alive and not missing from this facility." *See* https://www.alexandriava.gov/sheriff/info/default.aspx?id=92694.

Mr. Lazar does not contend that any of the information set forth above excuses his conduct; he admits and has accepted responsibility for his wrongful actions. Given the totality of the circumstances of this case, however, Mr. Lazar respectfully submits that a sentence of 36 months is appropriate.

    C.    *The Sentencing Guidelines*

Apart from the issue of criminal history category, there is no dispute regarding the advisory sentencing guideline in this case. The sentencing guidelines, however, are themselves a judgment call. They do not reflect, and are not intended to reflect, the unique factors present in any given case, most notably in this case, the 4-year undischarged sentence that Mr. Lazar received in Romania for the same course of conduct, and the 3-year sentence that he received for recidivating.

With respect to the § 1028A offense, the 24 month consecutive sentence is driven by statute, not by the guidelines, and is itself an arbitrary although mandatory aspect of sentencing. Indeed, this case is not a typical identity theft case where the defendant steals the identity of another for financial gain. Here, Mr. Lazar committed identity theft when he sent a message from one of the victim's accounts, pretending to be that person, to another person.

Yet even the guidelines recognize that when a defendant is prosecuted in multiple jurisdictions at the same time and faces an undischarged sentence of imprisonment from another jurisdiction, there may be instances where a concurrent or partially concurrent sentence is appropriate to achieve a "reasonable incremental punishment" for the federal offense. *See* U.S.S.G. § 5G1.3, Application Note 4(B); *see also id.* at § 5G1.3(d) ("In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to

run concurrently, partially concurrently or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense").[6]

In sum, it is respectfully submitted that the sentencing guideline range as calculated in the PSR is greater than necessary to satisfy the purposes of sentencing in this case given both Mr. Lazar's Romanian sentence as well as the mandatory 24 month sentence for Count 7.

    D.    *The Need to Achieve Deterrence, Avoid Unwarranted Sentencing Disparities, And Impose A Sentence That Protects The Public And Provides Just Punishment*

No one gainsays that Mr. Lazar committed serious wrongdoing and caused harm to victims, and must be punished accordingly. As has been emphasized repeatedly above, however, this case is unique in that the Court's sentence does not represent the only punishment that Mr. Lazar will receive for his misconduct or the only sentence of imprisonment that can achieve deterrence and protect the public. Given § 3553(a)'s mandate to impose the least amount of incarceration necessary to achieve the goals of sentencing, sentencing in this case necessitates consideration of the punishment imposed in Romania. The advisory guideline range, when combined with the 24-month mandatory sentence for Count 7, should carry less weight in terms of the appropriate sentence in this case in light of the separate and additional sentence of imprisonment that Mr. Lazar received in Romania, and the length of that prison sentence.

The government points to a case, *United States v. Chaney*, 11CR958, from the Central District of California which it contends is similar in nature to this instant case, and asks the Court to consider the 10 year sentence imposed by the court there as supporting its sentencing request

---

[6]As explained in the Application Notes section of this guideline, to effect a partially concurrent sentence, the Court must identify a specific date in the judgment upon which the federal sentence shall commence. *See* U.S.S.G. § 5G1.3, Application Note 4(B).

for Mr. Lazar.  As the pleadings and court documents make clear, however, the *Chaney* case presents a significantly different course of conduct than that at issue here.  The defendant in *Chaney* hacked into various victims' email accounts, all or most of whom appear to have been women, specifically looking for sexually explicit information, including nude photos, many of which he then made public in one way or another – either by forwarding to gossip websites or forwarding to members of the victims' family.  *See* Chaney Plea Agreement, Factual Basis, 12-15, attached as Exhibit H to Govt. Sent. Memo.  He also attempted to solicit additional sexually explicit photos from victims by assuming the identity of friends or others known to the victims.  *See id*.

It seems clear from the transcript of the sentencing hearing in *Chaney* that in imposing a ten-year sentence, the court was especially concerned about the sexual predatory nature of the defendant's conduct and the sexual dangerousness of the defendant.  *See Chaney*, 12/17/12 Tr., Doc. # 96, at 23, 33, 34, 66.  Indeed, the court commented more than once regarding the allegation, apparently contained in the PSR, that child pornography had been found on the defendant's computer, and ordered that the defendant submit to a psycho-sexual evaluation as part of his conditions of supervise release.  *See* Judgment at 2, in *United States v. Chaney*, 11CR598 (C.D. Ca.), attached hereto as Exhibit 2.

Mr. Lazar's misconduct, while undoubtedly serious, is wholly distinguishable and does not implicate the same safety concerns or risk factors raised by the defendant in *Chaney*.  While there is no dispute that multiple victims in this case suffered embarrassment or emotional distress as a result of his disclosure of private communications, there has never been any hint of the type of dangerousness that the *Chaney* court reacted to in imposing sentence in that case.

13

In any event and most importantly, were the Court to impose the sentence requested here by Mr. Lazar – a total of 36 months for both counts – Mr. Lazar will have received a total *global* sentence of imprisonment of 10 years when taking into account his Romanian prison sentence. Such a sentence is exactly the same as the sentence received by the defendant in *Chaney* and effectively demonstrates why the sentencing determination in this case must take into account Mr. Lazar's Romanian sentence in order to effect § 3553(a)'s mandate to impose the least amount of incarceration necessary to achieve the goals of sentencing.

In sum, in light of the 7-year prison sentence imposed upon Mr. Lazar in Romania, it is respectfully submitted that the sentence request by the government - $1^{1/2}$ years longer than that requested by Mr. Lazar - will have no greater impact towards the goals of sentencing than the 36 month sentence requested herein.

## CONCLUSION

For the foregoing reasons, Mr. Lazar respectfully requests that the Court impose a variant sentence of 12 months of incarceration for Count 5, plus the mandatory 24 month sentence for Count 7, as the least amount of incarceration necessary to achieve the goals of sentencing in this case. Mr. Lazar further requests that the Court recommend designation to a BOP facility as close as possible to Northern Virginia.

Respectfully submitted,

MARCEL LEHEL LAZAR

By Counsel,

By: _____/s/_____
Shannon S. Quill
Va. Bar No. 76355
Cadence Mertz
Va. Bar No. 89750
Assistant Federal Public Defenders
Attorney for Marcel Lehel Lazar
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
Shannon_Quill@fd.org (email)

**CERTIFICATE OF SERVICE**

 I hereby certify that on August 29, 2016, I will send a copy of the foregoing pleading, via e-mail, to:

Maya Song
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

A copy of the foregoing pleading will also be served by email to:

Tracey White
U.S. Probation Officer
401 Courthouse Square
Alexandria, Virginia 22314

                /s/
              Shannon S. Quill
              Va. Bar No. 76355
              Assistant Federal Public Defender
              Attorney for Marcel Lehel Lazar
              1650 King Street, Suite 500
              Alexandria, Virginia   22314
              (703) 600-0800 (telephone)
              (703) 600-0880 (facsimile)
              Shannon_Quill@fd.org (email)